**SHAPIRO, BERNSTEIN & CO., Inc., et al., Plaintiffs-Appellants,**

v.

**H. L. GREEN COMPANY, Inc., Defendant and Third Party Plaintiff-Appellee,**

**JALEN AMUSEMENT COMPANY, Inc., Defendant and Third Party Defendant.**

**No. 294, Docket 27979.**

United States Court of Appeals Second Circuit.

Argued March 27, 1963.

Decided April 15, 1963.

———◆———

Julien T. Abeles, New York City, for plaintiffs-appellants.

Sidney Hut, of Danson & Hut, New York City for defendant and third party plaintiff-appellee.

Before WATERMAN and KAUFMAN, Circuit Judges, and WEINFELD, District Judge.

KAUFMAN, Circuit Judge.

This action for copyright infringement presents us with a picture all too familiar in copyright litigation: a legal problem vexing in its difficulty, a dearth of squarely applicable precedents, a business setting so common that the dearth of precedents seems inexplicable, and an almost complete absence of guidance from the terms of the Copyright Act, 17 U.S.C. § 1 et seq. Compare Platt & Munk Co. v. Republic Graphics, Inc., 315 F.2d 847 (2d Cir. March 21, 1963); Shapiro, Bernstein & Co. v. Goody, 248 F.2d 260, 262, 266 (2d Cir. 1957), cert. denied, 355 U.S. 952, 78 S.Ct. 536, 2 L.Ed.2d 529 (1958). The plaintiffs in the court below, appellants here, are the copyright proprietors of several musical compositions, recordings of which have met with considerable popularity, especially amongst the younger set. The defendant Jalen Amusement Company, Inc. was charged in the complaint with having infringed the copyrights on these songs by manufacturing records, close copies of the "hit-type" authorized records of major record manufacturers in violation of 17 U.S.C. § 101

(e): "in the absence of a license agreement" with the plaintiffs and without having served upon them a notice of intention "to use a copyrighted musical composition upon the parts of instruments serving to reproduce mechanically the musical work."

Jalen operated the phonograph record department as concessionaire in twenty-three stores of defendant H. L. Green Co., Inc., pursuant to written licenses from the Green Company. The complaint alleged that Green was liable for copyright infringement because it "sold, or contributed to and participated actively in the sale of" the so-called "bootleg" records manufactured by Jalen and sold by Jalen in the Green stores.[1]

The District Judge, after trial, found Jalen liable as manufacturer of the "bootleg" records, and imposed a liability for the statutory royalty of two cents for each record which reproduced one of the plaintiffs' copyrighted compositions, and a further sum of six cents per record as damages. He concluded, however, that Green had not sold any of the phonograph records and was not liable for any sales made by Jalen; he accordingly dismissed the complaint as to Green. Jalen takes no appeal, but plaintiffs come before us to challenge the dismissal of the claims asserted against Green. The validity of those claims depends upon a detailed examination of the relationship between Green and the conceded infringer Jalen.

At the time of suit, Jalen had been operating under license from Green the phonograph record department in twenty-three of its stores, in some for as long as thirteen years. The licensing agreements provided that Jalen and its employees were to "abide by, observe and obey all rules and regulations promulgated from time to time by H. L. Green Company, Inc. * * *" Green, in its "unreviewable discretion", had the authority to discharge any employee believed to be conducting himself improperly. Jalen, in turn, agreed to save Green harmless from any claims arising in connection with the conduct of the phonograph record concession. Significantly, the licenses provided that Green was to receive a percentage—in some cases 10%, in others 12%—of Jalen's gross receipts from the sale of records, as its full compensation as licensor.

In the actual day-to-day functioning of the record department, Jalen ordered and purchased all records, was billed for them, and paid for them. All sales were made by Jalen employees, who, as the District Court found, were under the effective control and supervision of Jalen. All of the daily proceeds from record sales went into Green's cash registers and were removed therefrom by the cashier of the store. At regular accounting periods, Green deducted its 10% or 12% commission and deducted the salaries of the Jalen employees, which salaries were handed over by the Green cashier to one of Jalen's employees to be distributed to the others. Social security and withholding taxes were withheld from the salaries of the employees by Green, and the withholdings then turned over to Jalen. Only then was the balance of the gross receipts of the record department given to Jalen. Customers purchasing records were given a receipt on a printed form marked "H. L. Green Company, Inc."; Jalen's name was wholly absent from the premises. The District Judge found that Green did not actively participate in the sale of the records and that it had no knowledge of the unauthorized manufacture of the records.

When a District Court's determination of infringement hinges upon such purely factual questions as whether the defendant had access to the plaintiff's copyrighted materials and whether the physical acts of copying or selling actually occurred, the scope of review on appeal is limited to determining if the District Court's conclusions are clearly erroneous. Rosen v. Loew's, Inc., 162 F.2d 785 (2d Cir. 1947); Arnstein v.

---

1. For the background of the "disklegging" industry, see Note, "Piracy on Records," 5 Stanford L.Rev. 433 (1953).

Porter, 154 F.2d 464, 469 (2d Cir. 1946). But where, as here, the facts are undisputed, and the issue of infringement depends merely upon a legal conclusion to be drawn from a consideration of the parties' relationship, we feel that an appellate court's power of review need not be so constrained. On the facts before us, therefore, we hold that appellee Green is liable for the sale of the infringing "bootleg" records, and we therefore reverse the judgment dismissing the complaint and remand for a determination of damages.

■■■■■ Section 101(e) of the Copyright Act makes unlawful the "unauthorized manufacture, use, or sale" of phonograph records. Because of the open-ended terminology of the section, and the related section 1(e), courts have had to trace, case by case, a pattern of business relationships which would render one person liable for the infringing conduct of another. It is quite clear, for example, that the normal agency rule of *respondeat superior* applies to copyright infringement by a servant within the scope of his employment. See, e. g., M. Witmark & Sons v. Calloway, 22 F.2d 412, 414 (E.D.Tenn.1927). Realistically, the courts have not drawn a rigid line between the strict cases of agency, and those of independent contract, license, and lease. See Study No. 25, Latman & Tager, "Liability of Innocent Infringers of Copyrights", prepared for the Subcommittee on Patents, Trademarks, and Copyrights of the Senate Comm. on the Judiciary, 86th Cong., 2d Sess. 146. Many of the elements which have given rise to the doctrine of *respondeat superior*, see Seavey, Studies in Agency, 145–53 (1949), may also be evident in factual settings other than that of a technical employer-employee relationship. When the right and ability to supervise coalesce with an obvious and direct financial interest in the exploitation of copyrighted materials—even in the absence of actual knowledge that the copyright monopoly is being impaired, see De Acosta v. Brown, 146 F.2d 408 (2d Cir. 1944), cert. denied, Hearst Magazines v.

De Acosta 325 U.S. 862, 65 S.Ct. 1197, 89 L.Ed. 1983 (1945)—the purposes of copyright law may be best effectuated by the imposition of liability upon the beneficiary of that exploitation.

The two lines of precedent most nearly relevant to the case before us are those which deal, on the one hand, with the landlord leasing his property at a fixed rental to a tenant who engages in copyright-infringing conduct on the leased premises and, on the other hand, the proprietor or manager of a dance hall or music hall leasing his premises to or hiring a dance band, which brings in customers and profits to the proprietor by performing copyrighted music but without complying with the terms of the Copyright Act. If the landlord lets his premises without knowledge of the impending infringement by his tenant, exercises no supervision over him, charges a fixed rental and receives no other benefit from the infringement, and contributes in no way to it, it has been held that the landlord is not liable for his tenant's wrongdoing. See Deutsch v. Arnold, 98 F.2d 686 (2d Cir. 1938); cf. Fromont v. Aeolian Co., 254 F. 592 (S.D.N.Y. 1918). But, the cases are legion which hold the dance hall proprietor liable for the infringement of copyright resulting from the performance of a musical composition by a band or orchestra whose activities provide the proprietor with a source of customers and enhanced income. He is liable whether the bandleader is considered, as a technical matter, an employee or an independent contractor, and whether or not the proprietor has knowledge of the compositions to be played or any control over their selection. See Buck v. Jewell-LaSalle Realty Co., 283 U.S. 191, 198–199, 51 S.Ct. 410, 75 L.Ed. 971 (1931); Dreamland Ball Room, Inc. v. Shapiro, Bernstein & Co., 36 F.2d 354 (7th Cir. 1929); M. Witmark & Sons v. Tremont Social & Athletic Club, 188 F.Supp. 787 (D.Mass.1960); Remick Music Corp. v. Interstate Hotel Co., 58 F.Supp. 523 (D.Neb.1944), aff'd, 157 F.2d 744 (8th Cir. 1946), cert. denied, 329 U.S. 809, 67 S.Ct. 622, 91 L.Ed.

308

691 (1947); Buck v. Pettijohn, 34 F. Supp. 968 (E.D.Tenn.1940); Buck v. Crescent Gardens Operating Co., 28 F. Supp. 576 (D.Mass.1939); Buck v. Russo, 25 F.Supp. 317 (D.Mass.1938); Irving Berlin, Inc. v. Daigle, 26 F.2d 149 (E.D.La.1928), rev'd and remanded on other grounds, 31 F.2d 832 (5th Cir. 1929); M. Witmark & Sons v. Pastime Amusement Co., 298 F. 470 (E.D.S.C.), aff'd, 2 F.2d 1020 (4th Cir. 1924); Harms v. Cohen, 279 F. 276 (E.D.Pa. 1922); Comment, 8 Fordham L.Rev. 400, 407–08 (1939); 43 Harv.L.Rev. 828, 829 (1930).

■ We believe that the principle which can be extracted from the dance hall cases is a sound one and, under the facts of the cases before us, is here applicable. Those cases and this one lie closer on the spectrum to the employer-employee model than to the landlord-tenant model. Green licensed one facet of its variegated business enterprise, for some thirteen years, to the Jalen Amusement Company. Green retained the ultimate right of supervision over the conduct of the record concession and its employees. By reserving for itself a proportionate share of the gross receipts from Jalen's sales of phonograph records, Green had a most definite financial interest in the success of Jalen's concession; 10% or 12% of the sales price of every record sold by Jalen, whether "bootleg" or legitimate, found its way—both literally and figuratively—into the coffers of the Green Company. We therefore conclude, on the particular facts before us, that Green's relationship to its infringing licensee, as well as its strong concern for the financial success of the phonograph record concession, renders it liable for the unauthorized sales of the "bootleg" records.

The imposition of liability upon the Green Company, even in the absence of an intention to infringe or knowledge of infringement, is not unusual. As one observer has noted, "Although copyright infringements are quite generally termed piracy, only a minority of infringers fly the Jolly Roger." Letter from Sydney M. Kaye to the Copyright Office, in Study No. 22 Prepared for the Subcommittee on Patents, Trademarks, and Copyrights of the Senate Comm. on the Judiciary, 86th Cong., 2d Sess. 41 (Strauss, "The Damage Provisions of the Copyright Law"). While there have been some complaints concerning the harshness of the principle of strict liability in copyright law, see Barry v. Hughes, 103 F.2d 427 (2d Cir.), cert. denied, 308 U.S. 604, 60 S.Ct. 141, 84 L. Ed. 505 (1939); Chafee, "Reflections on the Law of Copyright," 45 Colum.L.Rev. 503, 526–27 (1945); cf. De Acosta v. Brown, 146 F.2d 408, 413 (2d Cir. 1944) (L. Hand, J., dissenting), courts have consistently refused to honor the defense of absence of knowledge or intention. The reasons have been variously stated. "[T]he protection accorded literary property would be of little value if * * * insulation from payment of damages could be secured * * * by merely refraining from making inquiry." De Acosta v. Brown, 146 F.2d at 412. "It is the innocent infringer who must suffer, since he, unlike the copyright owner, either has an opportunity to guard against the infringement (by diligent inquiry), or at least the ability to guard against the infringement (by an indemnity agreement * * * and/or by insurance)." Letter from Melville B. Nimmer to the Copyright Office, in Study No. 25 Prepared for the Subcommittee on Patents, Trademarks, and Copyrights of the Senate Comm. on the Judiciary, 86th Cong., 2nd Sess. 169 (Latman & Tager, "Liability of Innocent Infringers of Copyrights".)

For much the same reasons, the imposition of *vicarious* liability in the case before us cannot be deemed unduly harsh or unfair. Green has the power to police carefully the conduct of its concessionaire Jalen; our judgment will simply encourage it to do so, thus placing responsibility where it can and should be effectively exercised. Green's burden will not be unlike that quite commonly imposed upon publishers, printers, and vendors of copyrighted materials. See,

e. g., F. W. Woolworth Co. v. Contemporary Arts, Inc., 344 U.S. 228, 73 S.Ct. 222, 97 L.Ed. 276 (1952); Shapiro, Bernstein & Co. v. Goody, 248 F.2d 260, 264 (2d Cir. 1957); De Acosta v. Brown, 146 F.2d at 412; 93 U. of Pa.L.Rev. 459, 460 (1945). Indeed, the record in this case reveals that the "bootleg" recordings were somewhat suspicious on their face; they bore no name of any manufacturer upon the labels or on the record jackets, as is customary in the trade. Moreover, plaintiffs' agent and attorneys wrote to Green in March and April 1958, requesting information regarding certain of the "bootleg" records and finally, upon receiving no reply from Green, threatening to institute suit for copyright infringement. The suit was in fact commenced the following month. Although these last-recited facts are not essential to our holding of copyright infringement by Green, they reinforce our conclusion that in many cases, the party found strictly liable is in a position to police the conduct of the "primary" infringer. Were we to hold otherwise, we might foresee the prospect—not wholly unreal—of large chain and department stores establishing "dummy" concessions and shielding their own eyes from the possibility of copyright infringement, thus creating a buffer against liability while reaping the proceeds of infringement. Even if a fairly constant system of surveillance is thought too burdensome, Green is in the position to safeguard itself in a less arduous manner against liability resulting from the conduct of its concessionaires. It has in fact done so, by incorporating a save-harmless provision in its licensing agreements with Jalen.[2] See Study No. 23, R. Brown, Jr., "The Operation of the Damage Provisions of the Copyright Law: An Exploratory Study," Prepared for the Subcommittee on Patents, Trademarks, and Copyrights of the Comm. on the Judiciary, U. S. Senate, 86th Cong., 2nd Sess. 59, 86–88; Letters from Ralph S. Brown and Harry G. Henn to the Copyright Office, in Study No. 25, supra, at 164–65. Surely the beneficent purposes of the copyright law would be advanced by placing the jeopardy of Jalen's insolvency upon Green rather than upon the proprietor of the copyright.

The parties have raised a question as to the precise nature of Green's liability for the two cent royalty payment which the Copyright Act sets down as the measure of liability for the unauthorized sale of phonograph records embodying copyrighted musical compositions. See 17 U.S.C. § 101(e); Shapiro, Bernstein & Co. v. Goody, 248 F.2d 260, 266 (2d Cir. 1957). The appellee contends that its liability can only be joint and several with that of Jalen, which has been already found liable for infringement by sales of the "bootleg" records; Green claims, therefore, that there can be only a single recovery of the statutory royalty from Jalen or Green, and that its liability should be deemed "secondary" to that of Jalen. See Detective Comics, Inc. v. Bruns Publications, 28 F.Supp. 399 (S.D. N.Y.1939), aff'd, 111 F.2d 432 (2d Cir. 1940). The appellants, however, relying upon much of this Court's language in Shapiro, Bernstein & Co. v. Goody, 248 F.2d at 266–267, assert that Green's liability for the unlawful sales is several, thus permitting separate recoveries of the two cent royalty from Green as well as Jalen.

■ We note that this question of the nature of Green's liability is of practical moment *as between plaintiffs and Green* only if Jalen is found liable for infringement because of its sales of the "bootleg" records as distinguished from its manufacture thereof; for only in such a case are we presented with the possibility of double recovery for a single sale. Since

---

**2.** As an aftermath of this Court's decision in Shapiro, Bernstein & Co. v. Goody, supra, this note appeared in Variety:
"A flock of retailers and chain stores have already notified disk companies that they will not handle any disks from any company without indemnification or other guarantees that they will not be responsible for disks that are not licensed by publishers." Variety, Oct. 16, 1957, p. 63, col. 1.

the plaintiffs' complaint was apparently deliberately drawn so as to state a cause of action against Jalen solely for unauthorized manufacture, and since the District Court found Jalen liable only for that and not for unlawful sales, the question whether Green is liable in addition to Jalen, or merely as an alternative to Jalen, is moot, and need not be decided at this time.

Reversed and remanded.