COACH, INC., a Maryland corporation, and Coach Services, Inc., a Maryland corporation, Plaintiffs,

v.

SWAP SHOP, INC., a Delaware corporation, Swap Shop Management, LLC, a Florida limited liability company, 3290 Sunrise Investments, Inc., a Florida corporation, 3291 Sunrise Investments, Inc., a Florida corporation, Preston B. Henn, Betty D. Henn, Katherine Henn, Daphne Fitzpatrick, Rajwantie Rambharat, and Does 1 through 10, Defendants.

Case No. 12–60400–CIV.

United States District Court, S.D. Florida.

Sept. 21, 2012.

1272

George G. Mahfood, David B. Rosemberg, Broad and Cassel, Miami, FL, for Plaintiffs.

Bruce S. Rogow, Bruce S. Rogow PA, Fort Lauderdale, FL, Steven Harris Osber, Plantation, FL, for Defendants.

***ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS OR FOR MORE DEFINITE STATEMENT***

WILLIAM P. DIMITROULEAS, District Judge.

THIS CAUSE is before the Court upon Defendants SWAP SHOP, INC. SWAP SHOP, MANAGEMENT, LLC, 3290 SUNRISE INVESTMENTS, INC., 3291 SUNRISE INVESTMENTS, INC., PRESTON B. HENN, BETTY D. HENN, KATHERINE HENN, and DAPHNE FITZPATRICK (collectively, "Defendants")'s Motions to Dismiss or for More Definite Statement [DE's 44–50, 56]. The Court has carefully considered the Motions, Plaintiffs COACH, INC. and COACH SERVICES, INC. (collectively, "Coach")'s Omnibus Memorandum of Law in Opposition [DE 60], Defendants' Omnibus Replies [DE's 63, 64], and is otherwise fully advised in the premises.

## I. BACKGROUND [1]

A large flea market exists in Fort Lauderdale, Florida called "Thunderbird Swap Shop" or "Ft. Lauderdale Swap Shop" (hereinafter the "Flea Market"). This case arises from claims by Coach that the Flea Market has been and continues to be a hot-bed for vendors to sell illegal "knock-off" goods, including counterfeit Coach products.

Coach is engaged in the manufacture, marketing and sale of fine leather and mixed material products including handbags, wallets, and accessories including eyewear, footwear including shoes, jewelry and watches. *See* [DE 27] at ¶ 17. Coach has used a variety of legally-protected trademarks, trade dresses, and design elements/copyrights for many years on and in connection with the advertisement and sale of its products (collectively the "Coach Marks"). ¶ 18. Coach has expended substantial time, money, and other resources in developing, advertising, and otherwise promoting the Coach Marks. ¶ 19. As a result, products bearing the Coach Marks are widely recognized and exclusively associated by consumers, the public, and the trade as being high quality products sourced from Coach, and have acquired strong secondary meaning. ¶ 19. Coach products have also become among the most popular in the world, with Coach's

---

1. When considering a motion to dismiss, the Court takes the nonconclusory allegations of the complaint as true. *Ashcroft v. Iqbal,* 556 U.S. 662, 678–79, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Accordingly, this factual background relies upon the allegations of Plaintiffs' Amended Complaint [DE 27].

annual global sales reaching nearly four billion dollars ($4,000,000,000). ¶ 19.

Defendants 3290 Sunrise Investments, Inc. and 3291 Sunrise Investments, Inc. (collectively, the "Landlord Defendants"), are the owners and lessor of several parcels of real property upon which the Flea Market operates, and co-own the Flea Market. *See* [DE 27] at ¶¶ 9, 10. Defendants Swap Shop Inc. and Swap Shop Management, L.L.C. (hereinafter collectively referred to as the "Swap Shop Management") are the lessees and/or co-operators of the Flea Market. ¶¶ 11, 12. Defendants Preston Henn, his wife Betty Henn, their daughter Katherine Henn, and Daphne Fitzpatrick (collectively the "Principal Defendants"), individually and/or collectively, are the principal owners, officers, directors and managers of the Swap Shop Management and Landlord Defendants. ¶ 13. The Swap Shop Management, Landlord and Principal Defendants, individually and/or collectively, own, operate, control and the Flea Market. ¶ 14. Coach alleges in its Amended Complaint:

> Defendants, acting in concert with each other, operate out of the same offices, share common officers, directors and/or principal owners, and, in cooperation with and as the alter egos of one another, have induced, caused and/or materially contributed to the promotion and sale of counterfeit Coach products at the Flea Market. With knowledge of these illegal activities, or with willful blindness, Defendants have financially benefitted from them. As such, Defendants are contributorily and vicariously liable for the infringing activities described below.

*See* [DE 27] at ¶ 14. As for Defendants' infringing conduct, Coach alleges as follows:

On December 10, 2010, Coach's investigator canvassed the Flea Market and dis-

covered multiple vendors advertising, displaying, offering for sale, and/or selling in plain view merchandise bearing logos and source-identifying indicia and design elements that are imitations of one or more of the Coach Trademarks and the Coach Design Elements (hereinafter "counterfeit Coach merchandise"). ¶ 30. These vendors were located on property owned by Defendant 3291 Sunrise, and managed by Swap Shop Management and by and through the Principal Defendants. ¶ 30.

On that same day, following Coach's investigator's survey, the Broward Sheriff's office, together with the Lauderhill Police Department and Fort Lauderdale Police Department, raided the Flea Market, seizing hundreds of counterfeit items, including merchandise bearing Coach's trademarks and copyrights. ¶ 31. The infringing vendors' booths and cargo containers were located on property owned by Defendant 3291 Sunrise, and managed by Swap Shop Management and by and through the Principal Defendants. ¶ 31. The raid resulted in the arrest of six Swap Shop vendors, including Shakila Harannine and Palto Harannine. ¶ 31.

On January 3, 2011, Coach sent a cease and desist letter to the Landlord and Swap Shop Management Defendants, in order to compel their immediate cooperation in ending its and its vendors/lessees illegal activity. ¶ 32; [DE 27-1]. On January 13, 2011, Coach provided the Landlord, and Swap Shop Management Defendants with a second letter, containing a list of all federally registered Coach Trademarks in order to assist them in removing Coach counterfeit merchandise from the Flea Market. ¶ 33; [DE 27-2].

On November 30, 2011, Coach's investigator returned to the Flea Market and again discovered multiple vendors advertising, displaying, offering for sale, and/or selling in plain view counterfeit Coach

merchandise. ¶ 34. Specifically, Coach's investigator observed a vendor doing business as MVP Athletics advertising, displaying, offering for sale, and/or selling, in plain view, counterfeit Coach products including cellular phone covers. ¶ 35. MVP Athletics was operating from booth no. WC BB–13 on property owned by Defendant 3290 Sunrise, and managed by Swap Shop Management and by and through the Principal Defendants. ¶ 35. Coach's investigator also observed a vendor doing business as Florida Gift Shop International displaying, offering for sale, and/or selling, in plain view, counterfeit Coach products, including cellular phone covers. Florida Gift Shop was operating from booth no. WC T–16, on property owned by Defendant 3290 Sunrise, and managed by Swap Shop Management and by and through the Principal Defendants. ¶ 36.

On December 2, 2011, Coach sent a second cease and desist letter to the Landlord and Swap Shop Management Defendants, to compel their assistance in ending its and its vendors/lessees infringing activities. ¶ 37; [DE 27–3].

Shortly thereafter, on December 13, 2011, agents from the United States Department of Homeland Security Immigration and Customs Enforcement Division ("ICE"), along with the Broward Sheriff's Office raided the Flea Market, seizing more than 3,000 counterfeit items, including counterfeit Coach watches and cellular phone covers. ¶ 38. The infringing vendors' booths were located on property owned by Defendant 3290 Sunrise, and managed by the Swap Shop Management and by and through the Principal Defendants. ¶ 38.

Prior to carrying out the raid, ICE agents visited the Flea Market's management office to advise the Landlord, Swap Shop Management and Principal Defendants of their investigation and their plan to seize counterfeit merchandise from the Flea Market's vendors. ¶ 39. The agents specifically asked to meet with owner Preston Henn, however, they were told that Mr. Henn was unavailable because he was taking a nap in his office. ¶ 39.

On December 29, 2011, ICE, along with the Broward Sheriff's Office conducted a second investigation at the Flea Market. During their investigation, ICE agents purchased counterfeit merchandise, including counterfeit Coach hats, wallets and handbags, from vendors located on property owned by Defendant 3290 Sunrise, and managed by Swap Shop Management and by and through the Principal Defendants. ¶ 40. Less than two weeks later, on January 11, 2012, ICE, along with the Broward Sheriff's Office returned to the Flea Market. ¶ 41. This time, however, they purchased counterfeit merchandise, including counterfeit Coach items from vendors located on property owned by Defendant 3291 Sunrise, and managed by the Swap Shop Management and by and through the Principal Defendants. ¶ 41.

On January 24, 2012, ICE, along with the Broward Sheriff's Office raided the Flea Market a second time, seizing hundreds of counterfeit merchandise, including counterfeit Coach items from vendors located on property owned by Defendant 3291 Sunrise, and managed by Swap Shop Management and by and through the Principal Defendants. ¶ 42. The raid resulted in the arrest of numerous vendors, including "repeat offendors" Shakila Harannine and Palto Harannine. ¶ 43. The Harannines were operating their illegal business from the same booth and location where they had been arrested during the December, 2010 raid. ¶ 43.

On March 16, 2012, the Lauderhill Police Department returned to the Flea Market and again seized counterfeit merchandise, including counterfeit Coach handbags and wallets. ¶ 44. In this instance, the mer-

chandise was seized from vendor Rajwantie Rambharat, whose booth was located on property owned by Defendant 3291 Sunrise, and managed by Swap Shop Management and by and through the Principal Defendants. ¶ 44.

By facilitating counterfeiting activities at the Flea Market, as described herein, Swap Shop Management, Landlord and Principal Defendants have acted with reckless disregard for, and in bad faith and with willful blindness toward, Coach's trademark rights and copyrights. ¶ 49. Defendants have, either intentionally and deliberately, or with reckless disregard and willful blindness, unfairly benefitted from the illegal counterfeiting activities described herein. ¶ 50. The Swap Shop Management, Landlord Defendants and Principal Defendants' deliberate and/or reckless and/or willfully blind misconduct has caused, and continues to cause, substantial and irreparable harm to Coach's goodwill and reputation. ¶ 51. In addition, the damages caused by Defendants, which continue to accrue, are especially severe because the counterfeit Coach products sold at the Flea Market are cheap, inexpensive and grossly inferior in quality to those authentic to Coach. ¶ 51. The harm being caused to Coach is irreparable and Coach does not have an adequate remedy at law. ¶ 52. Coach therefore seeks the entry of an injunction preventing the sale of counterfeit Coach products at the Flea Market. ¶ 52. Coach also seeks damages, including exemplary damages and attorneys' fees, as a result of Defendants' knowing, deliberate and willful disregard of the activities infringing Coach's trademarks and copyrights. ¶ 52.

Plaintiffs Amended Complaint alleges the following nine causes of action: As to the Vendor Defendants (Rajwantie Rambharat, and Does 1 through 10)—Direct Trademark Infringement (Count I); Trademark Dilution (Count IV); Direct Copyright Infringement (Count VI); and Deceptive and Unfair Trade Practices (Count IX). As to the Swap Shop Management, Landlord and Principal Defendants—Contributory Trademark Infringement (Count II); Vicarious Trademark Infringement (Count III); Contributory Trademark Dilution (Count V); Contributory Copyright Infringement (Count VII); Vicarious Copyright Infringement (Count VIII); and Deceptive and Unfair Trade Practices (Count IX).

The Swap Shop Management, Landlord and Principal Defendants have moved to dismiss Coach's Amended Complaint as to those counts alleged against them pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim. Alternatively, the Swap Shop Management, Landlord and Principal Defendants request that the Court require Plaintiff to file a more definite statement.

## II. DISCUSSION

### A. Standard of Review

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is a motion attacking the legal sufficiency of a complaint. When considering a Rule 12(b)(6) motion to dismiss, the court accepts as true all factual allegations in the complaint and draws inferences from theses allegations in the light most favorable to the plaintiff. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Under the Federal Rules of Civil Procedure Rule 12(b)(6), a motion to dismiss will be awarded if the plaintiff fails to state a claim in which relief can be granted. According to Rule 8(a)(2) of the Federal Rules of Civil Procedure, a claimant must only state "a short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court in *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), set forth a pleading

standard in which the plaintiff must plead "enough facts to state a claim to relief that is *plausible* on its face." (emphasis added). "A court considering a motion to dismiss may begin by identifying allegations that, because they are mere conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the complaint's framework they must be supported by factual allegations." *Iqbal*, 556 U.S. at 664, 129 S.Ct. 1937.

### B. Defendant's Motion to Dismiss

*Count II—Contributory Trademark Infringement*

■ The Lanham Act identifies several forms of conduct that constitute actionable trademark infringement. *See* 15 U.S.C. §§ 1114(1)(a) & 1125(a). Liability under the Lanham Act may be imposed not just on direct infringers, but also on those who induce or facilitate the infringing conduct of others. *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 853–55, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982); *Coach, Inc. v. Gata Corp.*, 2011 WL 2358671, *6 (D.N.H. June 9, 2011). "To be liable for Contributory Trademark Infringement, a defendant must have (1) 'intentionally induced' the primary infringer to infringe, or (2) continued to supply an infringing product to an infringer with knowledge that the infringer is mislabeling the particular product supplied. *Perfect 10, Inc. v. Visa Intern. Service Ass'n*, 494 F.3d 788, 807 (9th Cir.2007) (citing *Inwood Labs.*, 456 U.S. at 855, 102 S.Ct. 2182).

The doctrine of contributory trademark infringement has been extended into cases brought against operators of flea markets that included vendors selling infringing goods. "One variety of such contributory infringement is when the defendant 'suppl[ied] the necessary marketplace for [the sale of the infringing product] in substantial quantities.'" *Adidas America, Inc. v. Kmart Corp.*, 2007 WL 2915594 (D.Or. Oct. 3, 2007) (quoting *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 265 (9th Cir.1996)).

■ In *Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1150 (7th Cir.1992), a flea market operator was sued based upon sales by flea market vendors of counterfeit Hard Rock t-shirts. The Seventh Circuit held "that the *Inwood Labs.* test for contributory liability applies" and that the flea-market operator "may be liable for trademark violations by [a vendor] if it knew or had reason to know of them." Additionally, the court held that the knowledge element for purposes of the Lanham Act can be met by demonstrating that the operator was "willfully blind." *Hard Rock*, 955 F.2d at 1149. "To be willfully blind, a person must suspect wrongdoing and deliberately fail to investigate." *Id. See also Coach, Inc. v. The Southwest Flea Market a/k/a 3rd Street Flea Market, et al.*, No. 2:10–cv–02410–DKV (W.D.Tenn., February 21, 2012) (stating that "ostrich-like business practices amount to willful blindness, which is sufficient to show the intent necessary to be a contributory infringer under the Lanham Act") (quoting *Coach, Inc. v. D & N Clothing, Inc.*, 2011 WL 2682969 (E.D.Mich. July 11, 2011) (quoting *Microsoft Corp. v. Rechanik*, 249 Fed.Appx. 476, 479 (7th Cir.2007)). *See* [DE 60–1]. However, negligence—*i.e.*, failure to take reasonable precautions against sales of counterfeit items—is insufficient for purposes of contributory liability of flea market operators for vendors' trademark infringement. *Hard Rock*, 955 F.2d at 1149.

In *Fonovisa*, the Ninth Circuit adopted the Seventh Circuit's application of the *Inwood* test to flea market operators, holding that a flea market operator could be liable for contributory trademark infringement if it supplied the necessary marketplace for the sale of infringing products.

*Id.* at 265. ("*Hard Rock Cafe's* application of the *Inwood* test is sound; a swap meet can not disregard its vendors' blatant trademark infringements with impunity.").

 However, an owner of property where the flea market is located, that leases the property to a separate entity that operates the flea market and rents space to a vendor, is not liable for contributory trademark infringement by virtue of its ownership, if it is not also the flea market operator. *See Malletier v. The Flea Market, Inc.*, 2009 WL 1625946 (N.D.Cal. June 10, 2009).

> No case supports the proposition that a property owner may be liable for contributory trademark infringement if it only leases property to a separate and distinct entity, which in turn operates a flea market and rents space to a vendor, which in turn infringes trademarks. Property ownership alone does not establish that Defendant exercised control over the sale of the infringing products.

*Id.* at *3. Accordingly, as Defendants 3290 Sunrise Investments, Inc. and 3291 Sunrise Investments, Inc. are alleged to own the real property upon which the Flea Market operates, but to lease the property to the Swap Shop Management Defendants, who operate the Flea Market, Plaintiffs' contributory trademark infringement claim fails as to Defendants 3290 Sunrise Investments, Inc. and 3291 Sunrise Investments, Inc.[2]

 As to the Swap Shop Management and Principal Defendants, Coach has stated a facially plausible claim for contributory trademark infringement. In *Fonovisa*, the Ninth Circuit indicated that raids and seizures, notifications of violations, and the presence of company investigators implied awareness. *See* 76 F.3d at 261. Here, while Defendants may not have had a duty to police its vendors for unknown violations, the alleged facts make it plausible that the Swap Shop Management and Principal Defendants were willfully blind to the violations, or had actual knowledge of them. Accordingly, the Swap Shop Management and Principal Defendants' motions to dismiss Coach's Contributory Trademark Infringement claim (Count II) shall be denied.

*Count III—Vicarious Trademark Infringement*

 " 'Vicarious liability' in the trademark context is essentially the same as in the tort context: the plaintiff seeks to impose liability based on the defendant's relationship with a third party tortfeasor." *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 165 (4th Cir.2012); *Perfect 10, Inc. v. Visa Intern. Service Ass'n*, 494 F.3d 788, 807 (9th Cir.2007). "Thus, liability for vicarious trademark infringement requires 'a finding that the defendant and the infringer have an apparent or actual partnership, have authority to bind one another in transactions with third parties or exercise joint ownership or control over the infringing product.' " *Id.* (quoting *Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1150 (7th Cir.1992)).

 A review of the Amended Complaint reveals that Plaintiffs have failed to allege factual allegations that demonstrate the requisite partnership between the allegedly infringing Vendor Defendants and

---

**2.** The Court accepts as true for purposes of this motion Plaintiffs' allegation in the Amended Complaint that Defendant Katherine Henn is a principal owner, officer, director and manager of the Swap Shop Management Defendants. However, if Katherine Henn is only an officer of Defendant 3291 Sunrise Investments, Inc., as she asserts in her Motion to Dismiss [DE 46], the Court will also dismiss the infringement claims as to Katherine Henn.

the Swap Shop Management, Landlord and Principal Defendants, or the requisite ownership or control over the infringing products. To the extent that Plaintiffs rely on the "right and ability to supervise" plus "direct financial interest" test that is applicable to the "more expansive doctrine of vicarious liability applicable to copyright violations," *see Hard Rock*, 955 F.2d at 1150, this legal theory of liability was advocated by the plaintiff in *Hard Rock* but was "expressly rejected by the Seventh Circuit." *See Vulcan Golf, LLC v. Google Inc.*, 552 F.Supp.2d 752, 780 (N.D.Ill.2008).

Accordingly, Plaintiff's cause of action for Vicarious Trademark Infringement (Count III) shall be dismissed for failure to state a claim.

*Count V—Contributory Trademark Dilution*

In Count V, Coach alleges that the Defendants are liable for contributory trademark dilution under 15 U.S.C. § 1125(c) because they knew or had reason to know of the alleged, ongoing trademark dilution on their premises and did nothing to prevent it. Defendants argue that Coach's claim for contributory trademark dilution should be dismissed because no appellate court or statute has yet established this cause of action. The Court disagrees.

The Eleventh Circuit has not yet recognized a cause of action for Contributory Trademark Dilution. Nonetheless, it appears that the claim has been generally recognized by those courts who have addressed it. *See, e.g., Coach, Inc. v. Gata Corp.*, 2011 WL 2358671 at *5 (noting that there is "no appellate decision rejecting the existence of such a cause of action"); *Microsoft Corp. v. Shah*, 2011 WL 108954 (W.D.Wash. Jan. 12, 2011); *Steinway, Inc. v. Ashley*, 2002 WL 122929 (S.D.N.Y. Jan. 29, 2002).

While Defendants are correct that the notion of "contributory dilution" remains somewhat novel, the viability of such a claim seems entirely plausible-a number of courts have discussed the notion of contributory dilution, and at least one court has implicitly recognized that cause of action, apparently by analogy to the cause of action for contributory infringement recognized by *Inwood Laboratories. See Kegan v. Apple Computer Inc.*, 1996 WL 667808, at *11 (N.D.Ill. 1996); *see also Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 986 (9th Cir.1999). *Steinway*, 2002 WL 122929, at *2.

 "To support its contributory trademark dilution claim, Coach must show that Defendants either encouraged others to dilute or, as in *Inwood Laboratories*, continued to supply their product 'to one whom it knows or has reason to know is engaging in trademark infringement....'" *Coach, Inc. v. Farmers Market & Auction*, 881 F.Supp.2d 695, 706 (D.Md.2012) (citations omitted). As set forth *supra*, the Court finds that Coach's alleged facts make it plausible that the Swap Shop Management and Principal Defendants were willfully blind to the violations that allegedly caused the trademark dilution, or had actual knowledge of them. Accordingly, the Swap Shop Management and Principal Defendants' motions to dismiss Coach's Contributory Trademark Dilution claim (Count V) shall be denied.

 However, the Court does not see any rational basis to extend liability for contributory trademark dilution farther than the liability for contributory trademark infringement. In other words, liability for contributory trademark dilution does not extend to an owner of the property on which the flea market is located by virtue of its ownership, where the owner leases the property to a separate entity that operates the flea market and rents space to a vendor. *See supra; see also Malletier*, 2009 WL 1625946, at *3. Ac-

cordingly, as Defendants 3290 Sunrise Investments, Inc. and 3291 Sunrise Investments, Inc. are alleged to own the real property upon which the Flea Market operates, but to lease the property to the Swap Shop Management Defendants, who operate the Flea Market, Plaintiffs' contributory trademark dilution claim fails as to Defendants 3290 Sunrise Investments, Inc. and 3291 Sunrise Investments, Inc.

*Count VII—Contributory Copyright Infringement*

■ In this claim, Coach alleges that Defendants are liable for contributory copyright infringement because they provided the site and facilities for known infringing activity and failed to take any action to prevent that infringing activity. Contributory copyright infringement occurs when one with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another. Contributory copyright infringement occurs where a party with knowledge of infringing activity materially contributes to the infringing conduct of another. *See Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 845 (11th Cir.1990); *Casella v. Morris*, 820 F.2d 362, 365 (11th Cir.1987); *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir.1971).

■ Similar to contributory trademark infringement, "actual knowledge is not required. All that must be shown [for contributory infringement] is that [defendant] had reason to know" of the infringing activity. *See Cable/Home*, 902 F.2d at 846 (citing *Casella v. Morris*, 820 F.2d 362, 365 (11th Cir.1987)); *see also Faulkner v. Nat'l Geographic Society*, 211 F.Supp.2d 450, 474 (S.D.N.Y.2002) ("Knowledge of the infringing activity may be actual or constructive. In other words, this prong is satisfied if the defendant knew or should

have known of the infringing activity at the time of its material contribution.") (internal quotations and citations omitted); *A & M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1020 (9th Cir.2001) ("Contributory liability requires that the secondary infringer 'know or have reason to know' of direct infringement") (citation omitted). As set forth above, Coach has sufficiently alleged Defendants' knowledge of the infringing activities by the vendors. *See Seoul Broadcasting System Intern., Inc. v. Young Min Ro*, 2011 WL 3207024, *9 (E.D.Va. July 27, 2011) (willful blindness to the possibility that the infringing parties were infringing the plaintiffs' copyrights is sufficient knowledge for purposes of liability for contributory copyright infringement); *see also A & M Records v. Napster, Inc.*, 239 F.3d 1004, 1020–23 (9th Cir. 2001) (holding that turning a blind eye to detectable acts of infringement for the sake of making a profit can give rise to liability for contributory copyright infringement).

■ In *Fonovisa*, the Ninth Circuit held that a swap meet operator providing site and facilities for known infringing activity is sufficient to establish contributory liability for copyright infringement. *See id.* at 264 ("Indeed, it would be difficult for the infringing activity to take place in the massive quantities alleged without the support services provided by the swap meet. These services include, *inter alia,* the provision of space, utilities, parking, advertising, plumbing, and customers."). Likewise, in this case, Coach has alleged that the operators of the Flea Market, *i.e.,* the Swap Shop Management and Principal Defendants, provided the means for their vendors to engage in sales of counterfeit Coach products, including leasing the space to the infringing vendors for their booths and cargo containers.

■ Based on the foregoing, the Swap Shop Management and Principal Defendants' motions to dismiss Coach's Contributory Copyright Infringement claim (Count VII) shall be denied. However, for the reasons set forth above regarding the indirect liability trademark infringement claims, ownership of the property on which the flea market is located, whereby the owner leases the property to a separate entity that operates the flea market and rents space to vendors, is an insufficient basis for establishing indirect liability. *See supra; see also Malletier,* 2009 WL 1625946, at *3. Accordingly, Coach's Contributory Copyright Infringement claim fails as to Defendants 3290 Sunrise Investments, Inc. and 3291 Sunrise Investments, Inc.

*Count VIII—Vicarious Copyright Infringement*

■ With regard to federal copyright law, "[a] party infringes vicariously by 'profiting from direct infringement while declining to exercise a right to stop or limit it.'" *Pegasus Imaging Corp. v. Northrop Grumman Corp.,* 2008 WL 5099691 (M.D.Fla. Nov. 25, 2008) (quoting *Metro–Goldwyn–Mayer Studios, Inc. v. Grokster, Ltd.,* 545 U.S. 913, 930, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005)). The defendant must have the right and ability to supervise the infringing activity and must have a direct financial interest. *Casella v. Morris,* 820 F.2d 362, 365 (11th Cir.1987); *Shapiro, Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304, 307 (2d Cir.1963). *See also Gershwin,* 443 F.2d at 1162 (holding that vicarious liability for copyright infringement occurs when one has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities).

In *Fonovisa,* the court found that a claim for vicarious copyright infringement was sufficiently alleged against the operator of a swap meet. *See* 76 F.3d at 262–64.

Regarding the direct financial benefit prong, the Ninth Circuit explained:

The facts alleged by Fonovisa, however, reflect that the defendants reap substantial financial benefits from admission fees, concession stand sales and parking fees, all of which flow directly from customers who want to buy the counterfeit recordings at bargain basement prices. The plaintiff has sufficiently alleged direct financial benefit.

*Id.* at 263. *See also Arista Records, Inc. v. Flea World, Inc.,* 2006 WL 842883, *12 (D.N.J. Mar. 31, 2006) (finding that receipt of rent from vendors selling infringing goods was direct financial benefit).

■ Here, Coach has alleged sufficient facts to make it plausible that the Swap Shop Management and Principal Defendants had the requisite right and ability to supervise the premises and obtained a direct financial benefit from the infringing activity. As to the first prong, Coach alleges that the Swap Shop Management and Principal Defendants operate and manage the Flea Market. *See* [DE 27] at ¶¶ 1, 11–13. As to the second prong, Coach alleges that the operators of the Flea Market have a direct financial interest in the infringing activities because they receive rents from their vendors, including those selling fake Coach products, along with parking and concession fees, which are fueled in large part by the draw created by the widespread availability of fake Coach products at the Flea Market. *See* [DE 27] at ¶ 86. Therefore, the Swap Shop Management and Principal Defendants' motions to dismiss Coach's Vicarious Copyright Infringement claim (Count VIII) shall be denied.

■ However, pursuant to Coach's allegations, any financial benefit to the Landlord Defendants *i.e.,* Defendants 3290 Sunrise Investments, Inc. and 3291 Sunrise Investments, Inc. appears to be only

indirect, as these Defendants are alleged to lease the real property to the operators of the Flea Market. *See* [DE 27] at ¶¶ 9, 10. Additionally, even if the Landlord Defendants' financial benefit was direct, rather than indirect, the allegations still do not support a claim for vicarious copyright infringement liability against them because they are not alleged to operate and manage the Flea Market, and therefore there are no factual allegations to support the supervise and control prong of the inquiry as to these Defendants. Accordingly, the Vicarious Copyright Infringement claim fails as to Defendants 3290 Sunrise Investments, Inc. and 3291 Sunrise Investments, Inc.

*Count IX—Deceptive and Unfair Trade Practices*

■ Lastly, Coach alleges in Count IX of the Amended Complaint that Defendants violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 ("FDUTPA"). The elements of a FDUTPA claim are: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Sundance Apartments I, Inc. v. Gen. Elec. Capital Corp.*, 581 F.Supp.2d 1215, 1220 (S.D.Fla.2008). A successful infringement claim supports a claim for violation of FDUTPA. *See Natural Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1333 (11th Cir. 2008) ("... [plaintiffs] claim for a violation of the Florida Deceptive and Unfair Trade Practices Act rises or falls on the success of its trademark infringement and false advertising claims"). *See also TracFone Wireless, Inc. v. GSM Group, Inc.*, 555 F.Supp.2d 1331 (S.D.Fla.2008) (noting that trademark infringement is an unfair and deceptive trade practice that constitutes a violation of FDUTPA).

Defendants argue that Coach's FDUTPA claim against them fails because Coach failed to state a claim with respect to Counts II, III, V, VII, and VIII. However, based upon the Court's analysis in the preceding sections, the Court found that nearly all of Coach's indirect liability infringement claims withstood motions to dismiss as to the Swap Shop Management and Principal Defendants. Accordingly, as Coach's FDUTPA claim "rises or falls" on the success of its infringement claims, the motions to dismiss Count IX shall be denied as to the Swap Shop Management and Principal Defendants. On the other hand, as the Court found that Coach's indirect liability infringement claims failed as to Defendants 3290 Sunrise Investments, Inc. and 3291 Sunrise Investments, Inc., the FDUTPA claim also fails as to these Defendants.

*Defendants' Motion for More Definite Statement*

■ As to Defendants' remaining arguments, seeking a more definite statement of Coach's claims, the Court finds that the instant motions should be denied. "A motion for more definite statement is appropriate if a pleading 'is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading.'" *Betancourt v. Marine Cargo Management*, 930 F.Supp. 606, 608 (S.D.Fla. 1996); Fed.R.Civ.P. 12(e). "Such a motion should be granted only when the pleading to which the motion is directed is so vague or ambiguous that the party cannot reasonably be expected to respond." *Joseph v. Nuno, Inc. II*, 2008 WL 2726918, *2 (S.D.Fla. July 10, 2008) (citing *Byrne v. Nezhat*, 261 F.3d 1075, 1128 (11th Cir. 2001)). Here, the Court finds that Coach's allegations sufficiently put Defendant on notice of the claims against them in order to formulate a response.

Accordingly, it is **ORDERED AND ADJUDGED** that Defendants' Motions to Dismiss or for More Definite Statement [DE's 44–50, 56] are hereby **GRANTED**

**IN PART AND DENIED IN PART** as follows:

1. Count II (Contributory Trademark Infringement), Count V (Contributory Trademark Dilution), Count VII (Contributory Copyright Infringement), Count VIII (Vicarious Copyright Infringement), and Count IX (FDUTPA) are **DISMISSED** for failure to state a claim as to Defendants 3290 Sunrise Investments, Inc. and 3291 Sunrise Investments, Inc. *only;*

2. Count III (Vicarious Trademark Infringement) is **DISMISSED** for failure to state a claim;

3. The remainder of the relief requested in Defendants' motions to dismiss is **DENIED;**

4. Defendants' alternative motion for more definite statement is **DENIED.**